# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| **Ravensafe, LLC** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No.: _____** |
| | ) | |
| **v.** | ) | |
| | ) | **COMPLAINT** |
| **American Lithium Energy Corp.,** | ) | |
| | ) | **(Jury Trial Demanded)** |
| **Defendant.** | ) | |
| | ) | |

Plaintiff Ravensafe, LLC, by and through its undersigned counsel, complaining of Defendant, American Lithium Energy Corp, alleges and says as follows:

## PARTIES

1. Plaintiff Ravensafe, LLC ("Plaintiff" or "Ravensafe") is a Delaware Limited Liability Company with is principal place of business being located in Weaverville, North Carolina.

2. Ravensafe has been authorized by the North Carolina Secretary of State to conduct business within North Carolina since at least 2023.

3. Ravensafe has a registered agent, whose office is located within North Carolina.

4. Upon information and belief, Defendant American Lithium Energy Corp ("Defendant" or "ALE") is a corporation organized and existing under and by virtue of the laws of the State of California with an office and principal place of business in Carlsbad, California.

## JURISDICTION

5. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1332 as there is complete diversity between the parties and the amount in controversy exceeds $75,000.

6. The state and common law causes of action are properly before this Court pursuant to 28 U.S.C. §§ 1338(b) and 1367.

7. Venue is proper under 28 U.S.C. § 1391(b), as a substantial portion of the acts or omissions alleged herein occurred in this District and Division. Moreover, the contract at issue designates the laws of the State of North Carolina as the governing law.

8. When negotiating the contract that is the subject of this action, ALE had been informed and was, therefore, aware that its primary point of contact, Ravensafe's CEO - Dan Conti, was at all relevant times located in and operating out Ravensafe of this District and Division.

9. When negotiating the contract that is the subject of this action, ALE routinely communicated with Mr. Conti via emails, phone calls and video conference calls, all of which were received by Mr. Conti in this District and Division.

10. During negotiations, ALE transmitted communications and documents into this District and Division containing the representations about which Ravensafe now complains as constituting negligent misrepresentation and/or fraud.

11. At the conclusion of negotiations, ALE executed a contract stating that North Carolina law would govern the contract.

12. ALE's communications with Mr. Conti continued throughout Defendant's performance of the contract with Ravensafe, thus ALE continued to transmit communications within this District and Division for purposes of performing the contract at issue.

13. During the performance of the contract, ALE transmitted communications and documents into this District and Division containing representations and promises that Ravensafe now alleges were not honored and therefore constitute breach of contract.

14. This Court has personal jurisdiction over Defendant because Defendant has established minimum contacts with this District and Division such that Defendant should reasonably anticipate being sued here and because such a lawsuit would not offend traditional notions of fair play and substantial justice.

## FACTUAL BACKGROUND

15. Ravensafe is in the business of developing, manufacturing and selling mobile energy storage systems and ultra-high power density battery packs.

16. Ravensafe primarily sells its products to governmental agencies such as states, cities, municipalities, various branches of the military and/or government contractors who provide goods or services to the government.

17. ALE is in the business of developing, manufacturing and selling Lithium-Ion power cells capable of being used in the energy storage products manufactured and sold by Ravensafe.

18. On or about March 14, 2025, Ravensafe entered into a contract with a government contractor name Raytheon, a subsidiary of RTX, Inc. ("Raytheon"), pursuant to which Ravensafe would develop and sell to Raytheon a mobile energy storage system known as the Archerfish Battery Assembly Unit (the "BAU"), comprising a 270 volt battery pack for a directed energy weapons pod used in the military's Apache helicopter.

19. Because the BAU was to be used in connection with a helicopter, the BAU was required to pass the military's flight safety standards.

20. Ravensafe sought to work with ALE for the purpose of procuring the Lithium-Ion power cells that Ravensafe needed to develop and deliver the BAU to Raytheon.

21. One of the reasons that Ravensafe selected ALE was because of ALE's SafeCore power cell technology that prevented power cells incorporating that technology from experiencing adverse thermal events that could compromise the safety of the Apache helicopter and/or its pilots.

22. On or about February 20, 2025, Ravensafe sent to RTX a proposal that was jointly authored by Ravensafe and ALE (the "Proposal") and outlined the specifications, requirements of Ravensafe's BAU, including the necessary power cells that were to be purchased from ALE.

23. The Proposal set forth the power cell requirements in terms of power storage, output and delivery and called for the power cells to include ALE's SafeCore technology.

24. The Proposal also sets forth other details such as purchase prices as well as delivery and performance deadlines for ALE's performance thereunder.

25. ALE represented that it could deliver power cells that incorporated the SafeCore technology and further meet the requirements outlined in the Proposal.

26. Based upon the information that Ravensafe provided to Raytheon, including the Proposal and ALE's representations contained therein, Raytheon awarded the BAU contract to Ravensafe on March 14, 2025.

27. On or about March 26, 2025, Ravensafe delivered to ALE a purchase order (the "PO") outlining the terms of Ravensafe's purchase of approximately 450 SafeCore power cells from ALE for purposes of developing and delivering the BAU to Raytheon.

28. The PO also incorporated the Proposal, Ravensafe's terms and conditions governing the PO and Raytheon's battery specification standard D4570499, which outlined the specifications Raytheon's requirements and specifications for the BAU being purchased from Ravensafe.

29. ALE accepted the PO at least by April 8, 2025.

30. Section 17 of the Terms and Conditions incorporated into the PO state that "Time is of the essence in fulfillment of the Order. Shipment and delivery shall be made in accordance with the Order."

31. The Proposal set forth various delivery deadlines which were based upon an anticipated start date of February 15, 2025, but stated that the deadlines would be adjusted relative to the date of actual contract award by Raytheon (i.e., March 14).

32. ALE failed to meet the delivery deadlines set forth in the proposal (and adjusted to account for the actual contract date) on at least nineteen occasions.

33. Specifically, ALE not only failed to deliver the SafeCore power cells in accordance with the deadlines set forth in the Proposal, but it also failed to meet critical deadlines set by Ravensafe as well as shipment deadlines that ALE set for itself and promised to Ravensafe.

34. According to the Proposal ALE was to provide 150 SafeCore power cells for safety testing by June 2025.

35. ALE delivered approximately 6 power cells on July 2, 2025 that included ALE's SafeCore technology but did not meet the power specifications outlined in the Proposal and PO.

36. On July 21, 2025, ALE delivered 18 power cells that did not include the SafeCore technology.

37. On July 25, 2025, ALE delivered an additional 34 power cells that again did not include the SafeCore technology.

38. None of the delivered power cells included ALE's SafeCore technology as required by the Proposal and/or PO.

39. The power cells that included the SafeCore technology did not meet the power requirements of the Proposal and/or PO.

40. The remainder of the power cells lacked the SafeCore technology required by the Proposal and/or PO.

41. In August 2025, Ravensafe tested the non-SafeCore power cells delivered by ALE.

42. The testing revealed that the delivered power cells experienced a thermal event that likely would not have occurred and/or would have been minimized had the power cells included the SafeCore technology.

43. While the performance of the power cells delivered did not comply with the Proposal and/or PO, the enclosure created by Ravensafe to house the power cells was sufficiently strong to be able to withstand the thermal event caused by the delivered power cells, thus allowing Ravensafe to continue to develop the BAU and to include the non-compliant ALE power cells in that system.

44. According to the Proposal and PO, ALE was to deliver all 450 power cells (minus the 52 non-SafeCore power cells already delivered) in August 2025.

45. ALE failed to deliver the power cells by that date.

46. ALE was shipping small batches of power cells (e.g., 5-10 at a time) at irregular intervals.

47. ALE would routinely represent to Ravensafe that a certain number of power cells would be shipped by a certain date and then fail to ship the power cells by the date promised.

48. Ravensafe demanded that ALE provide a delivery schedule for the outstanding power cells to be delivered.

49. ALE failed to provide the requested schedule.

50. According to the Proposal, Ravensafe was to ship the finalized BAU to Raytheon by October 28, 2025.

51.     Due to ALE's inability to timely deliver the power cells required to finalize the BAU, Ravensafe was unable to meet Raytheon's delivery deadline.

52.     After the delivery deadline was missed representatives of the U.S. Army requested a meeting with Raytheon, Ravensafe and ALE, which occurred on or about November 5, 2025.

53.     During that meeting, ALE represented to all parties present that it would ship a lot, approximately 150 power cells, by November 12, 2025 and the remaining power cells to be shipped by December 11, 2025.

54.     ALE failed to ship any power cells in accordance with the delivery schedule it provided during the meeting with the U.S. Army.

55.     ALE shipped 75 non-SafeCore power cells by November 12.

56.     On or about November 19, 2025, ALE stated that it would ship an additional 75 power cells by the week of December 29 and the remainder of the power cells by January 29, 2026.

57.     To this date, ALE has failed to ship all 450 power cells.

58.     To date, ALE has still failed to provide at least 145 of the power cells that were to be delivered pursuant to the Proposal and PO.

59.     ALE was unjustified in missing the delivery dates as there was no exception contained within the Proposal or PO that would justify ALE's late delivery.

60.     To this date, none of the power cells shipped by ALE meet the requirements of the Proposal and PO.

61.     In addition to the power cells' failure to include the SafeCore technology, many of the power cells shipped by ALE failed inspections conducted by Ravensafe and/or independent inspectors hired by Ravensafe.

62. ALE shipped power cells that suffered from mechanical issues such as non-uniform seams and seals, welding issues and bubbles in the cell pouches. These mechanical issues could lead to the power cells' inability to safely and/or consistently operate as intended.

63. ALE shipped power cells that suffered from performance issues such as cell-to-cell consistent voltage/power characteristics (i.e., voltage swings), impedance variations and self-discharge issues where the power cells would discharge (i.e., lose power) while not in use. These issues affected the performance and/or reliability of performance of the power cells.

64. Due to the frequency with which these issues were being detected, Ravensafe was forced to conduct extensive and unexpected inspections and related testing of the power cells delivered by ALE.

65. This additional testing should not have been required and cost Ravensafe in terms of both time and money.

66. Ravensafe returned 42 of the power cells received from ALE and requested that ALE provide a failure analysis as is required by the Proposal and PO and is standard within the industry and is required by the standards of ALE's safety certifications.

67. No such failure analysis was provided by ALE.

68. In response to Ravensafe's return of the power cells, ALE agreed that 6 of the power cells were defective but stated that the remainder of the power cells were "acceptable."

69. ALE never explained what testing it did to the power cells, what the results of that testing was, why some of the power cells were deemed acceptable or why Ravensafe's testing results or testing methods were incorrect and/or inaccurate.

70. ALE expressly stated that it would not perform any additional tests on the power cells returned by Ravensafe.

71. Such analysis is required both by the Proposal and PO and standard within the industry.

72. Ravensafe experienced a very concerning safety event where one of ALE's power cells vented while being used in one of the BAUs being tested by Ravensafe.

73. Ravensafe sent the battery to an independent tester to have the battery scanned by means of a CT scan and/or X-Ray scan, which revealed that one of the internal welds was incomplete, meaning part of the weld was left open, which led to the event.

74. This type of event could lead to consequences in the field, that will adversely affect the Archerfish system, and thus the Apache helicopter, and/or the pilots flying it.

75. Ravensafe sent the failed power cell along with the scan results to ALE.

76. Since receiving the failed power cell, ALE has never mentioned, discussed or otherwise provided analysis regarding this power cell.

77. Because of ALE's missed deadlines and delivery of defective power cells, Ravensafe has been unable to fulfill its contractual obligations to Raytheon by delivering the completed BAUs.

78. As a consequence, Ravensafe has withheld payment that would be owed to ALE upon its completion of its contractual obligations.

79. Ravensafe informed ALE that payment would be made upon delivery of the outstanding power cells.

80. Ravensafe even offered to pay ALE if it could commit to a delivery schedule and to provide a failure analysis of the defective power cells. ALE has refused to commit to or provide either.

81.     As a sign of good faith, Ravensafe even released payment upon ALE's delivery of approximately 32 power cells in December 2025. Ravensafe did so despite the fact that this delivery failed to comply with the delivery schedule that ALE provided during the meeting with the U.S. Army.

82.     ALE's failure to provide the power cells in a timely manner has caused Ravensafe damages, including extra expenses needed to pay contractors to stop and start work, prolonged rental periods for equipment needed to test the power cells and thus additional rental fees that would otherwise be avoided, the cost of additional testing that was not required of Ravensafe under the Proposal and PO, lost opportunity costs of being able to sell the BAU type system to interested buyers other than Raytheon, and reputational damages resulting from Ravensafe's inability to timely provide the BAUs having the specifications promised by Ravensafe.

83.     Some of the extra expenses incurred by Ravensafe include:

a.      approximately seven additional months (from November 2025 to the present) of rental costs (at approximately $11,568 per month) associated with the rental of certain testing equipment needed to test the ALE power cells;

b.      Approximately $20,000 in extra costs paid to contractors associated with the need to start and stop work due to ALE's untimely delivery of power cells; and

c.      Approximately $35,000 in costs associated with the additional testing of the power cells.

84.     On March 30, 2025, Ravensafe sent ALE a demand letter outlining the ways in which ALE had breached the Proposal and PO and requesting that ALE cure its defects and pay the damage caused by ALE's breaches.

85. After receiving Ravensafe's demand letter, ALE contacted Raytheon asking that Raytheon force RS to pay ALE out of payments that were being withheld and sent Raytheon a copy of ALE's accounts receivable.

86. Upon information and belief, ALE falsely stated to Raytheon that Ravensafe had breached its contractual obligations and/or was responsible for the failure to timely deliver to Raytheon the BAUs.

**FIRST CAUSE OF ACTION**
**Breach of Contract**

87. To the extent not inconsistent with the below, Ravensafe incorporates the above allegations as if fully repeated herein.

88. Ravensafe had a valid contract with ALE.

89. The contract required ALE to deliver 450 power cells that complied with the requirements and specifications outlined in the Proposal and Raytheon's battery specification D4570499.

90. The terms and conditions governing the PO stated that time is of the essence with respect to ALE delivery of compliant power cells.

91. The terms and conditions governing the PO stated that the power cells shall strictly conform to all specifications, drawings, samples or other descriptions contained in the Proposal.

92. The terms and conditions governing the PO stated that the power cells shall be fit and serviceable for the purpose intended, as agreed to by Ravensafe and ALE.

93. The terms and conditions governing the PO stated that ALE shall provide all information, facilities, and assistance necessary for Ravensafe's safe and convenient inspection of the power cells without additional charge.

94. The terms and conditions governing the PO stated that ALE shall include Ravensafe in any and all communications with the customer/end user pertaining to the order, which in this case was Raytheon.

95. ALE breached the contract by failing to deliver the required power cells.

96. ALE breached the contract by failing to meet delivery schedules required by the Proposal, PO and/or representations made by ALE.

97. ALE breached the contract by failing to provide failure analysis for non-compliant power cells.

98. ALE breached the contract when it contacted Raytheon to discuss the contract without Ravensafe's permission and/or consent.

99. ALE breached the contract by failing to properly safeguard materials, including copper tabs, provided by Ravensafe.

100. ALE failed to safeguard these materials when it lost the copper tabs provided by Ravensafe for ALE's use in the BAU's power cells, thus necessitating that Ravensafe send new copper tabs at Ravensafe's expense.

101. As a result of ALE's breach, Ravensafe is entitled to withhold payment pursuant to the terms and conditions which states that "Ravensafe shall have the right to reduce and set off against amounts payable under the Order any indebtedness or other claim which Ravensafe may have against Supplier [ALE], however and whenever arising."

102. As a result of ALE's breach, Ravensafe is entitled to terminate the contract for cause.

103. Ravensafe has suffered actual, consequential and incidental damages because of ALE's breach of contract.

104. Ravensafe's damages include additional expenses, costs and used resources incurred as a result of ALE's breach.

105. Ravensafe's damages further include lost opportunity costs and lost profits as well as reputational damages incurred because of ALE's breach.

## SECOND CAUSE OF ACTION
### Negligent Misrepresentation

106. To the extent not inconsistent with the below, Ravensafe incorporates the above allegations as if fully repeated herein.

107. Prior to executing the PO, ALE represented to Ravensafe that it could provide power cells that (a) included SafeCore and NTC technologies; and (b) met all of Ravensafe's requirements, including power capacity and delivery requirements.

108. Prior to executing the PO, ALE represented to Ravensafe that it could provide "power optimized 5Ah pouch cells with greater than 200 Wh/kg specific energy" that include "the patented safe technologies SafeCore/NTC technologies."

109. Prior to executing the PO, ALE represented to Ravensafe that it could deliver power cells that would meet the requirements of Raytheon's specification D4570499 and/or would be suitable for use in a battery system complying with such specifications.

110. These representations were false.

111. ALE knew or should have known that these statements were false.

112. The information provided by ALE regarding its capabilities to provide the required power cells was prepared by ALE without the use of reasonable care to ensure the accuracy of the information being provided.

113. The information provided by ALE was provided in the ordinary course of ALE's business and in association with a transaction from which ALE stood to profit.

114. ALE intended for Ravensafe to rely upon ALE's representations.

115. Ravensafe relied on the information provided by ALE.

116. Ravensafe was justified in relying upon the information provided by ALE, for at least the reasons that ALE had prior experience in the industry and with power cells like the ones at issue, had received patents on the technologies at issue and was in a superior position with respect to its capabilities.

117. Ravensafe was damaged by its reliance in that it entered into a contract that it would not have otherwise entered into with ALE and therefore suffered damages because ALE could not perform under the contract and/or in accordance with its representations.

118. After receiving Ravensafe's demand letter ALE contacted Raytheon to complain that Ravensafe had not paid all amounts due to ALE under the contract.

119. During that conversation, ALE falsely stated that Ravensafe was not legally and/or factually justified in withholding payments due under the contract and that Ravensafe had breached the contract with ALE and/or was responsible for the failure to deliver to Raytheon the BAUs in a timely manner.

120. These statements were false and were made in a transaction in which ALE had a pecuniary interest in receiving all outstanding payments and in which ALE sought Raytheon's assistance in obtaining those payments.

121. ALE failed to use reasonable care to ensure the accuracy of those statements.

122. ALE intended for Raytheon to rely on those statements.

123. Upon information and belief Raytheon did rely on those statements and has blamed (at least in part) Ravensafe for the failure to deliver timely the BAUs, thus causing Ravensafe reputational damage.

## THIRD CAUSE OF ACTION
## FRAUD

124. To the extent not inconsistent with the below, Ravensafe incorporates the above allegations as if fully repeated herein.

125. ALE's statements regarding its capabilities were false and were reasonably calculated to deceive.

126. ALE made these false statements with the intent that Ravensafe rely on those statements and award the contract to ALE.

127. Ravensafe was deceived by ALE's statements and relied upon them when awarding the contract to ALE.

128. Ravensafe's reliance was reasonable given that ALE had prior experience in the industry and with power cells similar to those at issue, had received patents on the technologies at issue and was in a superior position with respect to its capabilities.

129. Ravensafe was damaged by its reliance in that it entered into a contract that it would not have otherwise entered into with ALE and therefore suffered damages because ALE could not perform under the contract and/or in accordance with its representations.

## FOURTH CAUSE OF ACTION
## Defamation

130. To the extent not inconsistent with the below, Ravensafe incorporates the above allegations as if fully repeated herein.

131. ALE contacted Ravensafe's customer, Raytheon, and made false and disparaging remarks regarding Ravensafe's breach of the contract with ALE and its inability to timely provide the BAUs to Raytheon and/or Ravensafe's responsibility for failing to provide timely such a system.

132.    The statements made by ALE tend to impeach Ravensafe in its ability to perform in its trade or profession.

133.    ALE's statements were false and were made with an intent to injure Ravensafe as a means of forcing it to pay amounts that were being properly withheld pursuant to the PO and the Terms and Conditions governing that PO.

134.    ALE's statements caused Ravensafe reputational damage.

135.    ALE knew that the damage that Ravensafe suffered would be felt within this District and Division by virtue of the fact that it knew that Ravensafe primarily operated in this District and Division and out of its offices located within this District and Division.

**WHEREFORE**, Ravensafe hereby requests a jury determination of the issues raised and prays that this Court and/or the trier of fact award the following relief:

A.  A determination that ALE has breached its contract with Ravensafe and is liable for such;

B.  A determination that ALE has committed fraud and negligent misrepresentation and is liable for such;

C.  A determination that ALE has committed defamation and specifically slander per se and is liable for such;

D.  An award of damages, including Ravensafe's, actual consequential and incidental damages, including lost sales, reputational damages, the costs of the action and attorneys' fees, the amount of which is to be determined at trial; and,

E.  For such other relief as this Court deems just and proper.

**[Signature Block on Following Page]**

Respectfully Submitted,

KIM AND LAHEY LAW FIRM, LLC

*/s/ Doug Kim*
Douglas Kim (Fed. ID 9606)
3620 Pelham Road, PMB 213
Greenville, SC 29615
Tel. 864-609-3473
Doug@kimandlahey.com

*Counsel for Plaintiff*